Welcome. First case up is Shaw v. City of Selma. We'll hear from Mr. Sanders. How are you doing, Senator? I'm doing good, Judge. Good morning, Judge Black and Judge May. Judge, I would like to first take a couple of minutes to run over the facts of this case. There was a 911 call and it simply said disorderly at Church's Chicken. It didn't give any description or anything. That's all it said. And within a couple of minutes, police were in the area. They didn't go to Church's Chicken. They went, they saw, one of the officers saw Shaw walking down the street talking, did not have a hazard in his hand. And he didn't see him go into an abandoned laundromat, but he went and searched and found him there. And then they asked him to come out and directed him to come out. He came out and he came out and he had a hazard and he started walking away from them. The two officers who were there at first did not have on their cameras as required by the City of Selma. A third officer came and he had on his video. When he came out with the axe, he started walking away. And that's a video of this. And they told him to drop the axe, but it was a hatchet. But they said drop the axe. He continued down the road, walking away. He was cursing, saying he wasn't going to do it and kept walking. And at some point, the officer Williams, who had been hollering loud as that, told him, I will drop you. And he turned and said, shoot it. And the officer shot him. And there'll be a... Let me ask you this. Go ahead. I thought the evidence, the evidence construed in the light most favorable to your client showed that he not only turned, but he turned and started towards the officer. The video doesn't... I can't see that in the video. He turned and said, shoot it. Now, some of the other officers said that. There were other people who said that that wasn't the case. That's a key point. The lower court said he turned and launched at it. You can't... He said it was in the video. I can't see it in the video. And nobody else I have talked to and watched it with can see that in the video. And that becomes critical because... Go ahead. Yeah. I wasn't sure he was in the video sight or seen at the time that allegedly happened. I thought he was kind of at an angle and off the center of the video. He was off the center of the video, but you can't see him lunging at all. But my point was, even if he wasn't lunging, if he was walking towards the officers with a hatchet in his hand after being told repeatedly to drop the hatchet, that makes it a more difficult case for you than if he had just turned around wherever he was, I would think. But Judge, looking at the video, you can't see him turning and walking. I can't see it in the video. The question is, can you see him turning and not walking? I didn't gather that from the video. I thought he was where you couldn't tell. I could just see him turning and that was it. But one of the key facts in here, Judge, is the man told him, I'll drop you. And that's when he turned and said, shoot, shoot it. And I guess he was talking about shoot the pistol or shoot the gun. And that, to me, it seems to me, Judge, from these facts that this policeman had told him to drop the hatchet, he had refused. And whenever he said, shoot me, shoot, he shot him. And that's the heart of it. There was no warrant. This was a misdemeanor. Counsel, I was wondering if you address this Garzinski case that is in the 11th Circuit, because I do think that it may cause you some problems. Because in Garzinski, you did have someone that they had a gun. So it's a little bit different. But even if they assume that they didn't point the gun in his direction, the fact that he did not heed the commands to drop the deadly weapon provided some justification for the shooting. So explain how this case is different than that case. That's a gun. This was a hatchet. If you blow up the thing, you can see he was holding it down there. It was a very, very small hatchet. The other two officers said that they were going to knock it out, trying to knock it out of his hand. But this policeman wasn't trying to knock it out of his hand. This policeman was shooting him. So I can see that if somebody got a gun and turned, but if you got a hatchet and there's no evidence that it raised it in that video, and the other two officers didn't have on that video, if the other two officers had on that video as required by the city of Selma, then there wouldn't be any doubt about this. One way or another, we would know the case. But they did not have on that video a hatchet. Well, first, it's legal to have a gun. But it's certainly legal to have a hatchet. There was no reason that he had to drop the hatchet. They were demanding that he drop the hatchet. It wasn't in a danger to them because he was walking away from them. There was no danger to them. Now, he wasn't walking away from them at the time of the shooting, though. No, he was walking away from them and they were following him. And two officers were standing beside him. This is a 74-year-old homeless man. 74-year-old. You got three policemen there. And two of them said that they were going to try to knock it out of his hand. The other one used an entirely different standard. And so whenever he turned around and say, shoot it, he shot him. Is there anything in the record indicating any prior relationships between the officers and the man and they had to arrest him before? The reason I ask that is some of the conversations the officers, some of the statements officers made, it sounds like they had had dealings with him before. Like, Mr. Shaw, put the axe down, we won't hit you, man. And that kind of thing. What does the record show about that? Some of the officers have had, well, I don't know whether they took the inaction, but they pointed out that another officer had wrestled with him on another occasion. So he had, one of the officers had. But these officers knew that he was mentally ill. I'm sorry. This is a terribly tragic case. And we've had a number of these where there was irrational behavior by the decedent that seems to go beyond a lot of mental illness. Was there any autopsy? Was there also, and I'm not suggesting it's relevant to liability or not, but was there any indication that of drugs in addition to the mental illness? This seems so irrational. No, there was, I don't know of any indications of that, Jerry. But I want to just make. What do, what is in the record regarding Church's chicken? That the call was made, right, from saying there's someone here, please dispatch. Just say disorderly dispatch. Go ahead. Disorderly dispatch. And there was no mention of the hatchet. No mention of the person. No description of the person. No name. No mention of a hatchet in that dispatch. So these officers didn't know anything about a hatchet at that time. And the first officer who saw him, Jerry, did not have, he didn't have a hatchet in his hand. So I understand it. He was outside and he was denied entry. And then that's when the employee called and said, there's a disorderly person here. Would you dispatch or something like that? And there was a dispatch. Am I generally correct on the facts? Well, that's not my understanding. The record shows he goes to Church's chicken every morning and get one leg. Now he was a homeless man and I don't know where he got the money to get the one leg. But that was his routine on a daily basis to go to Church's chicken and get that one leg. It didn't say anything about him being outside at that time. The dispatch just simply said disorderly. And the proper procedure for the police was to go to Church's chicken.  They just simply went and saw him walking and decided it must be him and followed him and made him come out. Now he went on private property. He wasn't on the street when they made him come out. They made him come out on the street. So it wasn't like they saw a guy was talking to him on the street. I thought the call in from Church's was that a man, perhaps they identified him as Mr. Shaw, had attempted to enter the restaurant with a hatchet in hand, but had been turned away by the manager. Am I wrong about what went into the dispatcher? All I know is what the dispatcher said to the officers. So this is what the officers knew and was working on, saying disorderly at Church's. That was the basis that they were operating on. Even if there was some more information conveyed, it wasn't conveyed to the officers. The officers didn't have this information at the time. You know, we have cases in probable cause to arrest, at least, that says if one officer knows information supporting probable cause, that's imputed to everybody. I guess I haven't really thought about whether on an excessive force case, if one officer knows about something, but the officer doing the force doesn't know about it, that's also imputed to him on his side of the case. The reason that the probable cause imputes to all officers what any officer knows is it's supposed to be an objective test. And if there was probable cause to arrest somebody, no matter who it is, then it was a valid arrest. I'm not sure that would apply in an excessive force case if the officer actually using the force didn't know about a fact. Well, Judge, they didn't have probable cause for him. None of the officers had probable cause that he was the person. They didn't get that information. They simply saw him walking down the street. And the second point is, you had two officers there dealing with the situation. It was the third officer who came up on the situation, and the one who pulled his gun, and the one who began to shout at him as he walked away. And he continued to walk. And he said, I'm not going to put it down. Continued to walk away. He wasn't endangering any officer. And they continued to follow him. And the two officers said that they was right by him. They had out nightsticks or whatever you might call them in order to be able, Judge, to knock it out of his hand. One of them said, let me knock it out of his hand. But this officer continued with the gun and eventually shot him. Okay. We let you go a little bit over, but we'll give you your full five minutes in reply. Mr. Howard. Welcome and come talk to us. Morning. May it please the court. April McKay and I represent the city of Selma, Officer Williams, and Officer Boone. I would like to start by addressing some of the concerns that the court raised with Mr. Sanders. He mentioned that Mr. Shaw was mentally ill. That's speculation. There's nothing in the record that proves he was mentally ill. We know he was angry and deranged and had a deadly weapon. Also, there was an issue about Church's Chicken and whether he had a hatchet. Ricky Austin testified in his deposition that he barred Mr. Shaw from going into Church's Chicken because he was going in there with a hatchet. Days before that, I think it was three days before that, he actually made it into Church's Chicken with a pocket knife and was waving the pocket knife at people. I thought the district court's order said and had poked it at people. I mean... Poked it way... We can go with that. Does that mean he was waving it in a poking fashion or that some people got poked with it? No one got touched with the knife. I don't think anybody was poked with it. Mr. Shaw had a hatchet when he tried to go into Church's Chicken. He was the only individual walking away from Church's Chicken when the police arrived. He had a hatchet in his hand. This is not some... Did the dispatch to the officers who first arrived state that he had a hatchet or axe with him? I don't believe they did, but I know that Jones saw him walk away from Church's Chicken and go into the laundromat. With a hatchet in his hand. He did not say one way or the other. I do know that when the officers got there at the same time at the laundromat, they went in there to see about Mr. Shaw. He started waving the axe around at Officer Boone and at that time Officer Boone first drew his weapon and they backed out of the laundromat. And that's when Mr. Shaw came out and you can see it on the videotape. They told Mr. Shaw to drop the axe at least 26 times and he refused. And I'm sure you've seen the videotape. It is a tragic event. There's no doubt about that. On the video at the three minute and 26 second mark, you can see Mr. Shaw lunging at Officer Boone. He's walking away. He walks across a little ditch in front of the house where the citizens are at. He stops, makes eye contact with Officer Williams and comes towards him. You can't see the hatchet, but you can certainly see his shoulder and you know that hatchet's at the end of his arm. He's either going to make an upswing with that hatchet or come over the top and hit Officer Williams with it. We can look at the videotape again. I know I've seen it a couple of times, but I was under the impression you just stated, which is that he was moving towards the officers regardless of arm being up or not down or not up or whatnot. But that's your position as to what happened. He didn't just turn around and get shot. He was moving towards one of the officers anyway. Yes, Your Honor. He closed the distance between the officer. The officer's still, you can see the video cam. The video camera is of the officer who did the shooting. That officer's standing still. Mr. Shaw closes that gap. I will refer you to the deposition testimony of Jones. His testimony was so chilling. He said Mr. Shaw just stopped, turned and went directly towards Officer Williams and that's when the shot was fired. Judge May mentioned the Garzinski case. I think the Garzinski case is a closer call than this case. In that case, he was sitting in a car by himself with no citizen around. Here, we had a man walking through the neighborhood with a hatchet and he was obviously angry. The officers did say that they were going to try to knock it out of his hands. We had the force continue. We had somebody giving verbal commands. We had the asp and the baton and we had a gun out. The guy that had, Officer Boone had the asps and he was asking the deposition, why didn't you try to knock it out of his hand? Mr. Shaw told him if he touched him with that asp, he was going to hack his hand off. And that's exactly what Officer Boone testified. That's the reason he did not try to knock it out of his hand. You also ask if the officers... So your position is that the reason he didn't try to knock it off his hand wasn't that the other officer shot him before. He could have gotten a chance to try to do that. That's correct. Officer Boone was asked. He had an asp out. He first had his gun. You got a little bit of a sign of congestion. It sounds like you're talking about asp like a snake and I know you're probably not. It's called an asp or a baton. We can go... Spell that for me. A-S-P. That is a snake. I know, Your Honor, that it's a baton also. He had his baton out and was going to strike the individual with the baton. He said in his deposition that he did not strike the individual with the baton because Mr. Shaw would have hacked him. That's a quote from the officer. That was the plan, but Mr. Shaw changed that. Did he say that Mr. Shaw had said, I'll axe you if you try that or I'll cut you or anything? Did he make any threats towards the officer with the baton or asp? No. That was the officer's perception at the scene. He was asked, why didn't you just hit him with the baton? And the officer said because he would have, quote, hacked my arm off. Did the officer during the incident with the baton ever say he was going to do that or wanted to do that? Sir, could you repeat that? The officer who had the baton, did he ever make a statement before the shot was fired that he was going to try to knock it out of his hand or wanted to do so? Yes, Your Honor. That was the initial plan from Officer Boone. All right. But who did he say that to? Obviously the other officers. You can hear it on the video. He doesn't direct his comment to someone, but he does say it out loud and you can hear it. And how long before the shot was fired did he say that? I believe that statement came as they were coming out of the laundromat, probably at the two minute and 25 second mark. Don't quote me on that, but that's going to be close. And then things changed when Mr. Shaw walked off and ignored their commands. Okay. So that wasn't right before the shot was fired. I don't remember hearing that. I'll listen to it again. It's on the video, probably at the 2.25 mark. It's not just apparent. Officer Boone did testify to that fact and I believe it is in a footnote in Judge Steele's opinion at the exact mark on the video. You ask, was something unusual with Mr. Shaw at this time? Mr. Shaw's blood alcohol content was 2.6. Good gracious. 0.26 you mean? Yes, 0.26. Most of the facts in this case are on the video, 95%. The other 5% is what happened at Church's Chicken without the video. Mr. Austin testified that he did not let Mr. Shaw into Church's Chicken because he had a hatchet. There's no doubt after viewing the video that Officer Williams was faced with an imminent threat of danger and Mr. Shaw. I will also mention that the video, the authenticity has not been questioned. The video is, again, 95% of the facts in this case and we believe that that video shows that Officer Williams was faced with an imminent danger and that he should have received immunity. Things happen so quickly and the same people with good fates can do the same action and have different interpretations or recollections of it, which is why it really is an evidentiary blessing to have any video. Is there any explanation in the record why the other officers didn't have theirs going? They testified that they did not and I do not remember the reason. I know it's the policy, they just did not have it on, but thank goodness Officer Williams had his video on. Anything else? No, Your Honor. We urge this court to affirm the summary judgment given by Judge Steele. Okay. Counsel, we'll hear up to five minutes if you need it. Your Honor, three brief points. One point is, I believe the testimony from Officer Boone said that he and the other officers were walking side by side with Officer Williams who did the shooting and that they were going to knock it out at that point, but the shooting took place before they could knock it out. You have three officers here. You have two of them with a baton making a judgment there. You have one of them saying, let me knock it out, but Officer Williams maintained the gun and ignored the other officer in this situation. That's an example of how this ought to have been handled as opposed to the way that Officer Williams handled it. And anything that happened at Church's Chicken, these officers did not know it and that becomes key because they were acting on what their knowledge was and their knowledge was that there was a disorderly at Church's Chicken. They didn't have these other facts. They got all of these facts later on. They didn't have them at the time. Except the fact that he had a hatchet. No. I mean, before they shot, before the officer shot, everybody knew that. I had 28. Your brother over here says 26 times they asked him to drop the hatchet. They went into private property, got him out. He came out with the hatchet and was walking away with them. Now, they said that he was going to be a danger to them. He was walking away from them. He wasn't being a danger to them. He said they were going to be a danger to the public. There was no indication that they were going to be a danger to the public. They were determined that he had to put it down. I'm not sure I understand that argument. Are you saying that if there's a disorderly person who's non-responsive to their commands and he's got a hatchet in his hand, the officers can't stop him in disarming of that hatchet? Well, there's nothing illegal about having a hatchet. There's nothing illegal about having a hatchet. Yeah, but if there's a report of you being disorderly and the officers want to ask you about being disorderly and about having a hatchet in your hand and what you intend to do with it, and you won't stop and you ignore 26 commands to drop it, that's a totally different situation. But there was no evidence that they knew he had a hatchet before they went in and was dealing with him. They are using all of that to color the situation. Okay. The last point, Judge, is that if you look at it, you will see that the officers told him he was going to drop him. And when the officer told him he was going to drop it, he then turned around and said, shoot it. And he shot him. I think that needs to be taken into consideration. Thank you. Thank you, counsel. We'll take that case under submission. And now, here, oral argument, Barclay versus Deep Blue. Yes, yes. Only if you wish to do so. I wish to do so. I don't blame you. I've got to stay. Which doesn't indicate that I don't think maritime liens is a fascinating subject. Thank you. All right, Mr. Fontenot, we are ready when you...